IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SHERMAN J. DEBOSE, | ) | Case No. 1:19-cv-2529 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Sherman J. DeBose, seeks judicial review of the final decision of the
Commissioner of Social Security, denying his application for supplemental security income
("SSI") under Title II of the Social Security Act.  This matter is before me pursuant to 42 U.S.C.
§ 405(g) and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ.
P. 73.  ECF Doc. 15.  Because the ALJ's decision was supported by substantial evidence and
because DeBose has not identified any prejudicial application of legal standards, the final
decision of the Commissioner must be AFFIRMED.

## II.      Procedural History

DeBose previously filed for disability benefits on May 8, 2007 alleging his disability
began on March 1, 2006.  His prior application was denied by ALJ Traci Hixson on January 14,
2011.  (Tr. 63-77).[1]  ALJ Hixson found severe impairments of gastroesophageal reflux disease

---

[1] The administrative transcript is in ECF Doc. 10.

(GERD), degenerative joint disease of the right hand, depression and antisocial personality disorder.  (Tr. 68).  ALJ Hixson determined that DeBose was capable of performing medium work with certain limitations and that he could not perform any of his past relevant work.  (Tr. 70-72).

DeBose filed a new application for SSI benefits on November 17, 2016, alleging the same onset date as his first application.  (Tr. 188-189).  DeBose stated that the conditions that limited his ability to work were: 1.  Blind in one eye; 2. Mood with Psychosis; and 3. Arthritis. (Tr. 212).  The Social Security Administration denied DeBose's application initially and upon reconsideration.  (Tr. 112-118, 121-127).  DeBose requested an administrative hearing.  (Tr. 129).  ALJ Eric Westley heard DeBose's case on July 12, 2018 and denied the claim in an October 9, 2018, decision.  ALJ Westley found that DeBose *was* capable of performing his past work as a stores laborer but also made the alternative finding that given DeBose's RFC, he was capable of performing a substantial number of other available jobs.  (Tr. 15-26).  On August 30, 2019, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).  On October 29, 2019, DeBose filed a complaint seeking judicial review of the Commissioner's decision.  ECF Doc. 1.

## III.   Evidence

### A.      Relevant Medical Evidence

#### 1.      Physical Impairments

DeBose went to the emergency room on July 26, 2011 with complaints of right leg swelling.  (Tr. 408).  An ultrasound ruled out deep vein thrombosis, and DeBose was treated for a superficial skin infection.  (Tr. 408-409).  DeBose visited Neon Health Center in May 2012, October 2013 and July 2014 complaining of pain in his hand and legs.  He was diagnosed with arthritis and advised to use Tramadol or ibuprofen.  (Tr. 418-419, 443-448).  In November 2015,

DeBose went to the emergency room after lodging a needle into his arm when he was trying to use heroin.  (Tr. 465).

On January 20, 2016, DeBose started treating at the Care Alliance.  (Tr. 546-547).  He was diagnosed with schizoaffective disorder, insomnia, major psychotic depression, recurrent, blind left eye, hypertension, arthritis, and needle phobia.  (Tr. 553).  From June to November 2016, DeBose saw Dr. Franklin D. Price for chronic low back pain.  (Tr. 643-660).

### 2.  Mental Impairments

The Center for Families and Children ("CFC") assisted DeBose with filling out applications, finding transportation and grocery shopping.  He was assigned a CPST worker who came to his home, reminded him of appointments, took him places and checked in on him for several years.  A mental health assessment was conducted on September 23, 2014 by Tao Wang, LSW.  DeBose reported that his father and sister had recently died, a week apart from one another.  (Tr. 486).  Mr. Wang noted agitation/irritability, crying spells, depressed mood, visual hallucinations, impaired memory, lack of interest in activities, low energy, sleep problems, and flashbacks/intrusive memories.  (Tr. 487).  Mr. Wang diagnosed major depressive disorder, recurrent, severe with psychotic features, and PTSD.  He assigned a GAF score of 43.  (Tr. 489).

DeBose's wife called the CFC on January 21, 2015 with concerns because DeBose would not get out of bed.  (Tr. 493).  A CPST worker went to their house on January 23, 2015 and again on February 10, 2015.  DeBose seemed excited to receive services and completed a treatment plan with the worker, but he did not show up for his psychiatric appointment on February 16, 2015.  (Tr. 494-496).  The CPST worker continued to go to DeBose's house in March and April 2015.  DeBose would not leave his house but repeatedly promised to reschedule his psychiatric evaluation appointment.  (Tr. 497-503).  The CPST workers continued to maintain contact with DeBose and encouraged him to go to psychiatric evaluation appointments throughout 2015 and

3

the beginning of 2016.  However, DeBose did not go to his appointments for psychiatric evaluation during this period.  (Tr. 493-535, 564-579).

On February 11, 2016, a CPST worker took DeBose to a walk-in medicine/psychiatric appointment.  (Tr. 577).  DeBose reported hearing voices.  He had stopped taking his prescription for Risperdal because he heard it would cause him to grow breasts.  He appeared irritable in intervals and was talking to himself.  (Tr. 579).  DeBose did not appear for his March 10, 2016 appointment with his clinician.  (Tr. 580).  DeBose continued to struggle with treatment compliance and attending appointments.  (Tr. 586-627).

On December 2, 2016, DeBose reported that his mood was good; he stated that he still heard voices; and was only sleeping four hours a night.  He reported paranoia, depression, irritability, and anxiety.  (Tr. 628).  On December 22, 2016, DeBose presented as irritable, disengaged and guarded.  He exhibited decreased speech production and poor fund of knowledge, but his thoughts were concrete.  He stated that his medication was helpful, and he was functioning reasonably well.  (Tr. 634).

Records from CFC for 2017 show that DeBose had struggled to comply with treatment and to show up for scheduled appointments.  (Tr. 696-716, 750-780).  On January 23, 2017, DeBose reported being "okay."  He reported that Seroquel was helping with "the voices and stuff."  He denied recent auditory hallucinations or any recent altercations.  He reported stress over his wife's health.

On February 27, 2017, DeBose continued to report that his medication was helping with mood stability.  He reported sleeping nine hours per night.  (Tr. 710).  On March 29, 2017, DeBose reported that things were going okay and he felt better with medication.  (Tr. 777).

On November 3, 2017, DeBose expressed stress from his wife's health.  However, he stated that he felt that his "meds are working because everyday routines are not at all that

4

difficult." He also felt that his concentration and anhedonia had improved. (Tr. 763). On December 13, 2017, he reported his sleep was "okay," that he had improved motivation, that his depression was "being maintained," and he denied any hallucinations. (Tr. 760-762).

In January and February 2018, DeBose reported sleeping "pretty well" and that his medication was helping. He denied depression and said he had "no serious problems, other than his wife's health." (Tr. 755-759). He stated he was feeling as "good as can be expected." (Tr. 755).

### B.    Relevant Opinion Evidence

#### 1.    State-Agency Reviewing Physicians

On February 3, 2017, Maureen Gallagher, D.O., reviewed DeBose's records at the request of the administrative agency and found that there was insufficient evidence to evaluate DeBose's physical limitations. (Tr. 90). On May 20, 2017, Lynne Torello, M.D., reviewed DeBose's records and affirmed the opinion of Dr. Gallagher that there was insufficient evidence to evaluate DeBose's physical limitations. (Tr. 104-105).

In February 2017, state agency reviewing psychologist, Cynthia Waggoner, Ph.D., reviewed DeBose's medical records and opined that there was insufficient evidence to opine on his mental impairments. (Tr. 91-92). In May 2017, Joseph Edwards, Ph.D. affirmed the opinion of Dr. Waggoner. (Tr. 105-106).

#### 2.    Physical Impairment Examining Consultation – Dr. Dorothy Bradford

On December 11, 2012, as a part of DeBose's original disability application, Dr. Dorothy Bradford evaluated DeBose at the request of the administrative agency. (Tr. 420-430). She found that DeBose was limited to sedentary work but did not state specific functional limitations. (Tr. 428).

### 3.    Mental Impairment Examining Consultation – Sally Felker, Ph.D.

Sally Felker, Ph.D., examined DeBose in October 2007 for a prior disability application. She opined that DeBose was mildly impaired in his ability to concentrate for sustained tasks, but not impaired in his ability to understand and follow instructions.  She found that his capacity for carrying out tasks was compromised.  She opined that he was moderately impaired in his ability to relate to others (including work peers and supervisors), deal with the general public and tolerate the stress of employment.  (Tr. 393).

### 4.    Mental Impairment Examining Consultation – Dr. David V. House

In December 2012, Dr. David V. House also evaluated DeBose's mental impairments for a prior disability application.  (Tr. 432-439).  Dr. House observed that DeBose had fair grooming and hygiene and walked without difficulty.  (Tr. 434).  He found that DeBose was oriented to person, place, time and situation, but his pace was slow.  He could not subtract 7 from100, but he could do serial threes.  His memory for digits was satisfactory, but his remote memory was only fair.  DeBose's speech was irritable and "somewhat isolating in manner."  (Tr. 435).

Dr. House diagnosed a mood disorder, not otherwise specified, PTSD, unknown substance abuse in reported remission, and personality disorder, not otherwise specified, with antisocial features.  He noted that these conditions were chronic.  (Tr. 437).  Dr. House opined that DeBose's ability to carry out instructions was inconsistent, his concentration and attention were not well developed, his ability to follow multistep instructions was inconsistent.  (Tr. 438). DeBose was isolating, and he would have significant levels of stress interacting socially.  Dr. House opined that DeBose would be dysfunctional and disruptive in a work environment.  He concluded that DeBose exhibited a serious impairment in employability; he was socially inept; and his prognosis was poor because his conditions were chronic.  (Tr. 439).

### C.      Relevant Testimonial Evidence

ALJ, Eric Westley, conducted an administrative hearing on October 9, 2018.  (Tr. 32-62).
DeBose testified at the hearing.  (Tr. 42-55).  DeBose was born on March 2, 1957 and was sixty
years old.  He dropped out of high school in 10th grade, but later earned a GED.  (Tr. 42).  He
took college classes while in prison and earned an associate degree.  (Tr. 42-43).  DeBose was
living in a house with his wife.  (Tr. 43).

DeBose was able to bathe and dress himself.  He was able to prepare sandwiches for
himself.  (Tr. 50).  He was able to go grocery shopping, but he did not clean or do laundry.  (Tr.
51).  He had not had a car in years, but had not forgotten how to drive.  (Tr. 52).

DeBose had last worked in 2007, driving a pick-up truck and hauling things for people.
He stopped doing this because he "couldn't function."  (Tr. 43-44).  Before that, he worked at a
thermal treatment center as a small parts/material handler.  (Tr. 44-45).  It was not a fast-paced
job (Tr. 52), and he did not have any quota.  (Tr. 54).

DeBose felt that he could no longer work due to pain in his legs, knee and back, and
cramping in his hands.  (Tr. 46-47).  He received ibuprofen for the pain and felt that it helped.
He also acknowledged that he had been told that he had a mood disorder because he couldn't get
along with people.  He was taking medication for his mood disorder that helped sometimes.  (Tr.
47-48).  He said he heard "a voice" telling him things, but it did not tell him to harm himself.
DeBose said he had a hard time getting along with people and would have a problem with a boss
telling him what to do.  (Tr. 50).

DeBose felt that he could probably lift about five pounds; would have trouble standing in
one place and would have even more trouble walking.  (Tr. 48-49).  He occasionally used a cane
to walk.  He did not like to sit for a long time.  (Tr. 49).   Both of his hands occasionally cramped
up.  (Tr. 54).

Vocational Expert ("VE") Lanelle Hall also testified at the hearing.  (Tr. 55-61).  The VE considered DeBose's past work to be that of a stores laborer.  (Tr. 56).  The VE opined that an individual who could perform work at the medium exertional level, but could frequently climb ramps or stairs; could never climb ladders, ropes, or scaffolds; could frequently stoop, kneel, crouch, or crawl; needed to avoid all exposure to hazards, such as unprotected heights, moving machinery and commercial driving; could understand, remember and carry out simple instructions in a routine work setting; could respond to supervisors, coworkers, and work situations if the tasks performed were goal-oriented and did not require a production rate pace; and, in relations to others, was limited to speaking, signaling, serving, taking instructions and helping, would be able to perform DeBose's past work, as it was actually performed, but not as it is generally performed.  (Tr. 58-59).  This individual would also be able to work as a laundry worker, a kitchen helper, and a floor waxer.  (Tr. 60).  There were a significant number of these jobs in the national economy.  If the individual were limited to work at the light exertional level, he would be able to perform the same jobs, including DeBose's past job as it was actually performed.  However, if the individual was limited to work at the sedentary level, he would not be able to perform DeBose's past work.  (Tr. 60).  If the individual was off task 20% of the time or was absent more than two days a month, he would not be able to perform any work in the national economy.  (Tr. 61).

## IV.    The ALJ's Decision

At the outset of his opinion, the ALJ found that he was not bound by ALJ Hixson's 2011 decision for the unadjudicated period after January 15, 2011 because there had been a material change in DeBose's condition and the substantial evidence of record supported a change in DeBose's RFC.  (TR. 15-16).  The ALJ then made the following findings relevant to this appeal:

> 5.  DeBose had the residual functional capacity to perform medium work except
>     that he could only frequently climb ramps and stairs; could never climb

8

ladders, ropes or scaffolds; could frequently stoop, kneel, crouch or crawl; must avoid all exposure to hazards, including unprotected height, moving machinery, and commercial driving; could understand, remember, and carry out simple instructions in a routine work setting; could respond appropriately to supervisors, coworkers, and work situations if the tasks performed were goal-oriented, but not at a production rate pace; could speak, signal, serve or take instructions from others, but could not interact with the general public. (Tr. 20-21).

6. DeBose was capable of performing his past relevant work as a stores laborer because it did not require the performance of work-related activities precluded by DeBose's RFC.  (Tr. 24).

Based on all his findings, the ALJ determined that DeBose was not under a disability from February 9, 2007, through the date of his decision.  (Tr. 26).

## V.    Law & Analysis

### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. §§ 405(g), 1383(c)(3); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  If supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court might reach a different conclusion or if the evidence could have supported a different conclusion.  42 U.S.C. §§ 405(g), 1383(c)(3); *see also Elam*, 348 F.3d at 125 ("The decision must be affirmed if . . . supported by substantial evidence, even if that evidence could support a contrary decision."); *Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially

9

supported in the record.").  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if supported by substantial evidence, however, the court will not uphold the Commissioner's decision when the Commissioner failed to apply proper legal standards, unless the error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting Sarchet v. Charter, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals

any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant

can perform his past relevant work in light of her RFC; and (5) if not, whether, based on the

claimant's age, education, and work experience, he can perform other work found in the national

economy.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc.

Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to

produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient

evidence to prove that he is disabled and, thus, entitled to benefits.  20 C.F.R. §§ 404.1512(a),

416.912(a).

### B.  *Res Judicata* **and Past Relevant Work**

DeBose argues that the ALJ erred by failing to properly apply *res judicata* and the

holding of *Dennard v. Sec. of Health & Human Services,* 907 F.2d 598 (6th Cir. 1990) to the

prior ALJ's finding that DeBose was unable to perform his past relevant work.  The

Commissioner argues that any error in the ALJ's finding that DeBose was capable of performing

past relevant work as a store laborer was harmless because there was substantial evidence that

DeBose could make an adjustment to other work.  ECF Doc. 13 at 12.

The issue of whether or when a subsequent ALJ must follow findings made by a prior

ALJ was addressed by the Sixth Circuit in *Dennard v. Secretary of Health and Human Services,*

907 F.2d 598 (6th Cir. 1990) and *Drummond v. Commissioner of Social Security,* 126 F.3d 837

(6th Cir. 1997), as well as by the Social Security Administration in Acquiescence Rulings 98-

3(6), 1998 SSR LEXIS 4 and 98-4(6), 1998 SSR LEXIS 5.  And, the Sixth Circuit revisited this

line of authority in *Earley v. Commissioner of Social Security,* 893 F.3d 929 (6th Cir. 2018).

### 1.  *Dennard v. Secretary of Health and Human Services*

Claimant Dennard filed an application for benefits which was eventually denied on the

ground that, while he could no longer perform his past relevant work, he retained the ability to

11

perform sedentary exertional level jobs, which existed in significant numbers.  *Dennard*, 907 F.2d at 598-99.  Dennard later reapplied for benefits.  The latter application was denied by an ALJ on the ground that Dennard could perform his past relevant work.  *Id.* at 599.  An appeal of this decision to federal district court was unsuccessful.  The Sixth Circuit reversed the district court and ordered that the matter be remanded for further consideration.  *Id.* at 600.  Specifically, the court held that the second ALJ was estopped, on *res judicata* grounds, from contradicting the prior determination that Plaintiff was unable to perform his past relevant work.  *Id.*

## 2. ***Drummond v. Commissioner of Social Security***

Claimant Drummond applied for benefits but was denied on a finding that, while she could no longer perform her past relevant work, she could perform sedentary level jobs that existed in significant numbers.  *Drummond*, 126 F.3d at 838.  Drummond later reapplied for benefits but was denied on the finding that she retained the ability to perform medium work.  *Id.* at 838-39.  After unsuccessfully appealing the matter in federal district court, Drummond pursued the matter in the Sixth Circuit.  *Id.* at 839-40.  Based, in part, on the *Dennard* decision, the *Drummond* court held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances."  *Id.* at 840-42.  Thus, if an earlier ALJ has made a finding regarding a claimant's RFC, a later ALJ is bound by that RFC determination absent evidence to the contrary.  *See, e.g., Gay v. Commissioner of Social Security*, 520 F. App'x 354, 356 (6th Cir., Apr. 2, 2013).

## 3. Acquiescence Rulings 98-3(6), 1998 SSR LEXIS 4 and 98-4(6), 1998 SSR LEXIS 5

Finding that *Dennard* and *Drummond* conflicted with Social Security policy, the Social Security Administration issued Acquiescence Rulings 98-3(6), 1998 SSR LEXIS 4 and 98-4(6),

1998 SSR LEXIS 5.  With respect to how *Dennard* and *Drummond* differed from Social Security

policy, the Social Security Administration observed:

> Under SSA policy, if a determination or decision on a disability claim has become
> final, the Agency may apply administrative res judicata with respect to a
> subsequent disability claim under the same title of the Act if the same parties,
> facts and issues are involved in both the prior and subsequent claims.  However, if
> the subsequent claim involves deciding whether the claimant is disabled during a
> period that was not adjudicated in the final determination or decision on the prior
> claim, SSA considers the issue of disability with respect to the unadjudicated
> period to be a new issue that prevents the application of administrative res
> judicata. Thus, when adjudicating a subsequent disability claim involving an
> unadjudicated period, SSA considers the facts and issues de novo in determining
> disability with respect to the unadjudicated period.

AR 98-3(6), 1998 SSR LEXIS 4, 1998 WL 274051 at 29771; AR 98-4(6), 1998 SSR LEXIS 5,

1998 WL 274052 at 29773.

To resolve the conflict between Sixth Circuit authority and Social Security policy, the

Social Security Administration concluded that it would apply *Dennard* and *Drummond*, within

the Sixth Circuit:

> When adjudicating a subsequent disability claim with an unadjudicated period
> arising under the same title of the Act as the prior claim, adjudicators must adopt
> such a finding from the final decision by an ALJ or the Appeals Council on the
> prior claim in determining whether the claimant is disabled with respect to the
> unadjudicated period unless there is new and material evidence relating to such a
> finding or there has been a change in the law, regulations or rulings affecting the
> finding or the method for arriving at the finding.

AR 98-3(6), 1998 SSR LEXIS 4, 1998 WL 274051 at 29771; AR 98-4(6), 1998 SSR LEXIS 5,

1998 WL 274052 at 29773.  In other words, the Social Security Administration adopted, with

respect to applications brought within the geographic territory of the Sixth Circuit, the holdings

in *Dennard* and *Drummond.*

**4.** ***Earley v. Commissioner of Social Security***

In 2012, an ALJ denied Claimant Earley's application for disability benefits, finding that

she retained the ability to perform a limited range of light duty work.  *Earley*, 893 F.3d at 930.

Earley subsequently submitted another application for benefits, but was likewise denied based on Earley's failure to provide "new and material evidence of a changed circumstance" as required by *Drummond*. *Earley*, 893 F.3d at 931. Earley appealed the matter to federal court resulting in a decision that the preclusion rule articulated in *Drummond* applied only if application of such benefitted the claimant. *Earley*, 893 F.3d at 931. The matter was appealed to the Sixth Circuit, which took the opportunity to reexamine the *Drummond* decision.

Observing that "[u]nusual facts . . . led to some overstatement in *Drummond*," the court nevertheless concluded that "*Drummond* correctly held that *res judicata* may apply to administrative proceedings." *Earley*, 893 F.3d at 933. Thus, if a claimant files a second application covering the same period of time, *res judicata* properly applies absent good cause to revisit the earlier determination. As the court further recognized, however, *res judicata* has no application where a claimant files a subsequent application seeking benefits for a distinct period of time. Accordingly, "[w]hen an individual seeks disability benefits for a distinct period of time, each application is entitled to review." *Id.*

The court was careful, however, to make clear that "[f]resh review is not blind review." *Id.* at 934. Thus, while an ALJ evaluating a subsequent application for benefits may not be bound to follow a previous determination, he may nevertheless "consider what an earlier judge did if no other reason than to strive for consistent decision making." *Id.* Accordingly, "it is fair for an [ALJ] to take the view that, absent new and additional evidence, the first [ALJ's] findings are a legitimate, albeit not binding, consideration in reviewing a second application." *Id.* at 933. In sum, *Earley* stands for the proposition that when an ALJ evaluates a subsequent application for benefits, covering a distinct period of time, the ALJ can properly consider a previous ALJ's RFC assessment and errs only when he considers the previous RFC a mandatory starting point

for the analysis.  *See, Arendt v. Commissioner of Social Security*, 2019 U.S. Dist. LEXIS 35973, 2019 WL 1058263 (N.D. Ohio, Mar. 6, 2019).

### 5.    Application and Analysis

Here, ALJ Westley expressly considered ALJ Hixson's decision, Acquiescence Ruling 98-4(6) and *Drummond.*  (Tr. 15-16).  He further acknowledged that he was not permitted to reexamine previously determined issues absent new and material evidence, or a change in the law, regulations or rulings.  (Tr. 15).  He then found that there was no new or material evidence with respect to the previously adjudicated period, through the date of the prior decision and that *res judicata* applied to that period.  Thus, he purportedly limited his decision to the unadjudicated period beginning on January 15, 2011.  (Tr. 15-16).

It is worth noting here that the ALJ did not err by considering the new evidence in relation to the unadjudicated period.  Nor did he err in deciding that DeBose's RFC had changed. Several years had passed, and DeBose's complaints and reasons for applying for disability were somewhat different.  However, there is no indication that DeBose's functional abilities had improved.[2]  And, because his past relevant work pre-dated the first ALJ's decision, the ALJ's finding that DeBose could now perform his past relevant work did not comply with Acquiescence Ruling 98-3(6) and *Dennard.*

Moreover, ALJ Westley did not adhere to his own finding that *res judicata* precluded him from reconsidering evidence related to the period before January 15, 2011.  DeBose last worked in 2007.  (Tr. 44-45).  Thus, the evidence of his past work was either considered by ALJ Hixson or it was new evidence.  Because ALJ Westley found that no new evidence had been submitted

---

[2] The ALJ stated that the evidence failed to demonstrate any significant worsening of the claimant's physical impairments.  (Tr. 22).  DeBose argues that this statement implies that there was also no evidence that his condition had improved.  (ECF Doc. 11 at 16).  The court generally agrees with DeBose's argument – the evidence did not show a significant overall improvement in his functional abilities.  However, it appears that some of DeBose's impairments may have improved, such as in his indigestion and weight.

for that period, it follows that the evidence of DeBose's past relevant work had already been considered by ALJ Hixson and that *res judicata* prevented ALJ Westley from reconsidering it.

ALJ Hixson found that Westley was unable to perform his past work.  According to ALJ Hixson's own finding that no new or material evidence has been submitted for the period prior to January 15, 2011, he should have adopted ALJ Hixson's finding that DeBose was unable to perform his past relevant work.  As already stated, his contrary finding did not comply with *Dennard* and AR 98-3(6).

### 6.    Harmless Error

The Commissioner argues that he ALJ's error was harmless.  ECF Doc. 13 at 12.  After all, the VE testified that an individual with DeBose's RFC, as determined by the ALJ, was also able to perform other jobs that existed in substantial numbers in the national economy (Tr. 59-60), and the ALJ made this express alternative finding in his decision.  (Tr. 24-25).  As already noted, the ALJ did not err by considering new evidence for an unadjudicated period and arriving at a revised RFC.  And, even if he had, some *Drummond* errors may be harmless.  *See, Ford v. Berryhill,* 2017 U.S. Dist. LEXIS 88926, 207 WL 2531588, * 3 (W.D. Ky. June 6, 2017).

There are three general types of *Drummond* harmless errors.  *Id*.  The first type occurs when the current RFC is more favorable to the claimant than the prior RFC.  *Id*.  The second type of harmless error may occur when, although the current RFC may appear to be less favorable to the claimant, "it may be substantially the same as the prior one in light of the definitions in the Social Security Rulings (SSRs) and other sources[.]"  *Id*.  Third, the error may be harmless when the jobs relied upon by the current ALJ in support of his finding of no disability do not require the additional capacity.  *Id.*

ALJ Hixson found that DeBose had the residual functional capacity to perform medium work except that he could only frequently handle, finger and feel; he could perform simple,

16

routine tasks with simple, short instructions, and few work place changes; he could make simple work related decisions; he could have minimal public contact; and he could not work in a job that requires production rate pace.  (Tr. 70).  In comparison, ALJ Westley found that DeBose had the residual functional capacity to perform medium work except he could only frequently climb ramps and stairs; could never climb ladders, ropes or scaffolds; could frequently stoop, kneel, crouch or crawl; must avoid all exposure to hazards, including unprotected height, moving machinery, and commercial driving; could understand, remember, and carry out simple instructions in a routine work setting; could respond appropriately to supervisors, coworkers, and work situations if the tasks performed were goal-oriented, but not at a production rate pace; could speak, signal, serve or take instructions from others, but could not interact with the general public.  A side-by-side comparison highlights the differences in the RFC findings:

|  | ALJ Hixson's 2011 Decision | ALJ Westley's 2018 Decision |
|---|---|---|
| Medium Work | X | X |
| Frequently handle, finger and feel | X | |
| Simple, routine tasks with simple, short instructions few work place setting/routine setting | X | Simple instructions in a routine work setting |
| Simple work place decisions | X | |
| Minimal public contact | X | **No** general public contact |
| No production rate pace | X | X |
| Frequently climb ramps and stairs | | X |
| Never climb ladders, ropes or scaffolds | | X |
| Frequently stoop, kneel, crouch or crawl | | X |
| Avoid all exposure to hazards | | X |

Arguably, ALJ Westley's RFC finding was more favorable to Debose or substantially the same as ALJ Hixson's RFC determination.  But even if it wasn't, the jobs relied upon by ALJ Westley in support of his finding of no disability do not require the additional capacity that may be read into his RFC determination.  Thus, any error in the updated RFC finding was harmless.

But DeBose has not really argued that the ALJ erred in how he evaluated the new evidence or made a different RFC finding.  In fact, if the ALJ had *not* taken a fresh look at the record and reassessed DeBose's RFC, his claim would have still been denied because ALJ Hixson had found that he was capable of a range of medium exertion work, subject to limitations.  Rather, DeBose argues that the ALJ erred by finding that he could perform his past relevant work.  Then, DeBose argues that the new RFC finding was not supported by substantial evidence.  Thus, although the *Dennard* and *Drummond* analyses are often intertwined, in this case, they are distinct.  Here, the court must decide whether the ALJ's error was harmless under *Dennard,* and then consider whether the new RFC was supported by substantial evidence.

Like *Drummond* errors, errors related to Acquiescence Ruling 98-3 and *Dennard* may also be harmless.  See, *McKenzie v. Colvin,* 2015 U.S. Dist. LEXIS 173916 (E.D. Mich. 2015).  The Commissioner must adhere to its own procedures, but failure to do so is harmless error unless the claimant has been prejudiced or deprived of substantial rights.  *Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 654 (6th Cir. 2009).  An ALJ's failure to use an "adjudicatory tool" that does not change the outcome of the decision is harmless.  *Id.* at 655-56.  That is exactly what happened here.

The ALJ determined that DeBose could perform his past relevant work – an error under *Dennard* and Acquiescence Ruling 98-3.  However, he also asked the VE whether there were other jobs in the national economy that someone with DeBose's RFC could perform, and the VE said that there were.  The ALJ stated:

In the alternative, considering the claimant's age, education, work experience, and residual functional capacity, there are other jobs that exist in significant numbers in the national economy that the claimant also can perform.  (20 CFR 404.1569, 404.1569a, 416.969 and 416.969a)

* * *

If the claimant had the residual functional capacity to perform the full range of medium work, a finding of "not disabled" would be directed by the Medical Vocational Rule 203.13 and Rule 203.06.  However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations.  To determine the extent to which these limitations erode the unskilled medium occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.  The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as the following:

- Laundry worker, DOT 361.685-018 medium, unskilled, SVP: 2, with 130,000 jobs in the national economy;
- Kitchen helper, DOT 318.687-010; medium, SVP 2, with 270,000 jobs nationally; and
- Floor waxer, DOT 381.687-034, medium, SVP:2, with 40,000 jobs nationally.

Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned concludes that considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  A finding of "not disabled" is therefore appropriate under the framework of the above-cited rules.

(Tr. 24-25).  In other words, even if the ALJ had determined that DeBose could *not* perform his past relevant work, his decision on DeBose's application was still supported by the alternative determination that there was other work DeBose *could* perform.

Accordingly, even if the ALJ were required to correct his finding that DeBose could perform past relevant work, it would make no difference in the outcome because the ALJ would still find that DeBose was not disabled.  The court does not remand when it "would be an idle

and useless formality."  *Kobetic v. Comm'r of Soc. Sec.,* 114 F. App'x 171, 173 (6th Cir. 2004)

(quoting *NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 766 n.6, 89 S. Ct. 1426, 22 L. Ed. 2d 709

(1969) (noting that in such instances courts are not required to "convert judicial review of agency

action into a ping-pong game.")); *see also Fisher v. Bowen,* 869 F.2d 1055, 1057 (7th Cir. 1989)

("No principle of administrative law or common sense requires us to remand a case in quest of a

perfect opinion unless there is reason to believe that remand might lead to a different result."

(citations omitted)).  Because the ALJ's error at Step Four was harmless[3], the court will not

remand his decision on that basis.

### C.     RFC Determination

DeBose also argues that the ALJ's new RFC determination lacked the support of

substantial evidence.  An ALJ must determine a claimant's RFC by considering all relevant

medical and other evidence.  20 C.F.R. §§ 404.1520(e), 416.920(e).  The RFC is an assessment

of a claimant's ability to do work despite his impairments.  *Walton v. Astrue*, 773 F. Supp. 2d

742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS

5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions

imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p,

1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs,

laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. §§

404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

It appears that the ALJ complied with these regulations.  The ALJ considered DeBose's

allegations regarding his abilities.  (Tr. 21).  He considered the medical records showing sporadic

---

[3] Because the court finds that ALJ Westley's error at Step Four was harmless, it is not necessary to determine
whether the ALJ also erred by accepting the VE's characterization of DeBose's past work, whether it was consistent
with the *DOT*, and/or how the operation of a tow motor could have impacted the ALJ's Step Four determination.
The court has already found that the ALJ erred at this step.

and conservative treatment. (Tr. 22-23).  And he considered the opinion evidence.  (Tr. 22-23).

DeBose has not really argued that the ALJ failed to consider specific evidence related to his

claim.  Rather, he argues that the ALJ weighed the evidence differently than DeBose would

have.  This is not grounds for a finding of error.

DeBose argues that the ALJ erred by assigning minimal weight to the findings of Dr.

Bradford.  ECF Doc. 11 at 17-18.  Dr. Dorothy Bradford evaluated DeBose at the request of the

administrative agency for DeBose's disability application in December 2012.  (Tr. 421-426).

Most of her testing of DeBose's muscle strength and range of motion yielded normal results.

(Tr. 421-424).  Despite this, and without describing any specific functional limitations, Dr.

Bradford stated that DeBose should be restricted to sedentary activity.  (Tr. 428).  Dr. Bradford's

opinion was submitted after DeBose's prior application was denied; ALJ Hixson had relied on

the opinions of Dr. Sally Felker.  (Tr. 72).

ALJ Westley stated the following regarding Dr. Bradford's opinion:

> The undersigned has considered the observations and opinions of the consultative
> examining physician, Dorothy Bradford, MD, who evaluated the claimant in
> connection with a prior application covering this period.  The claimant presented
> with several physical complaints, including arthritis and indigestion.  He reported
> feeling chronically ill, and having decreased energy and activity level.  (Exhibit
> C9F, p. 6).  Physical examination revealed normal station, posture, and unassisted
> gait.  There was normal range of motion in the extremities, as well as normal
> stability, strength, and tone.  Neurological functioning revealed no deficits.
> (Exhibit C9F, p. 7-8).  An x-ray of the right hand on that date revealed mild
> degenerative joint disease of the first metacarpalphalangeal joint, with remaining
> joints normal in appearance.  (Exhibit C10F, p. 2).  Dr. Bradford opined that the
> claimant would be limited to sedentary activity, but provided no additional
> explanation for this assessment, and it appeared to be based solely on the
> claimant's subjective reports, as the physical examination was essentially
> unremarkable for any deficits of the spine or extremities.  Therefore, the
> undersigned can accord minimal weight to these conclusions.

(Tr. 22).

Dr. Bradford was not a treating physician, and the ALJ was not required to articulate

good reasons for the weight he assigned to her opinion.  *See Smith v. Comm'r of Soc. Sec.*, 482

F.3d 873, 876 (6th Cir. 2007) (declining to address whether an ALJ erred in failing to give good reasons for not accepting non-treating physicians' opinions).  Nevertheless, ALJ Westley *did* provide good reasons for assigning minimal weight to her opinion.  Dr. Bradford did not explain her finding that DeBose should be limited to sedentary work, and the objective findings from her testing seemed to contradict her opinion.  Given the normal examination findings, it was logical for ALJ Westley to conclude that Dr. Bradford's opinion was based on DeBose's subjective reports.  DeBose's argument that the ALJ erred by assigning minimal weight to Dr. Bradford's opinion lacks merit.

DeBose also argues that the ALJ did not take into account the effect his psychological impairments had on his ability to seek treatment on an ongoing basis.  ECF Doc. 11 at 18.  The problem with this argument is that DeBose has not cited any supporting evidence from the record.  Nor has he cited any statement from the administrative hearing that would support this argument.  Because there is no evidence that DeBose's mental impairments prevented him from seeking more treatment, DeBose is essentially arguing that the ALJ should have *assumed* this was the case and disregarded the actual evidence which showed that DeBose only sporadically sought conservative treatment for his mental impairments.  The ALJ was required to consider all of the evidence in the record, and it appears that he did.  He was *not* required to discount that evidence on an assumption that DeBose would have sought more treatment but for his mental impairments.  DeBose's unsupported argument to the contrary is not well taken.

DeBose also argues that the ALJ had no basis for disregarding the limitations set forth by Dr. House (that DeBose would have significant levels of stress when interacting with others).  DeBose argues that the ALJ should not have rejected Dr. House's opinions and should have assigned greater weight to Dr. Felker's 2007 opinion.  ECF Doc. 11 at 18-19.  Regarding these opinions, the ALJ stated:

>   The undersigned has considered the opinions of the prior consultative examining
>   psychologists.  By comparison, the evaluation performed by Sally Felker, Ph.D.,
>   on October 1, 2007 revealed significantly less symptomology and functional
>   difficulty than the subsequent findings of Dr. House on December 12, 2012.
>   (Exhibit C5F, C11F).  There was no evidence in the treatment record that
>   demonstrated significant decline of the claimant's mental functioning or increased
>   symptomology since that time, especially when he was complaint with treatment
>   recommendations.  Therefore, the more moderate limitations suggested in the
>   prior consultative evaluation are given more weight, as they were more consistent
>   with even the claimant's allegations that he stopped working due to physical
>   symptoms rather than mental difficulties.

(Tr. 23).

The ALJ was not required to assign controlling weight to the opinions of Dr. Felker or

Dr. House, and he was not required to state good reasons for the weight he assigned to their

opinions.  *See Smith,* 482 F.3d at 876.  He *was* required to consider their opinions and the fact

that they examined DeBose.  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir.

2013); 20 C.F.R. §§ 404.1527(c), 416.927(c).  He did just that.  The ALJ reviewed the medical

evidence and found that there was little evidence of any decline in Mr. DeBose's mental

functional abilities from 2007 to 2012.  He then determined that Dr. Felker's opinions were more

consistent with the overall medical evidence.  These determinations were within his zone of

choice.  Even if this court disagreed with these findings, we are not permitted decide the facts

anew, evaluate credibility, or re-weigh the evidence.  *Jones,* 336 F.3d at 476.  DeBose has not

identified any misapplication of legal standards by the ALJ in how he assessed the medical

opinions, and the court must affirm the ALJ's determination.

DeBose finally argues that, if he had been limited to the sedentary or light levels of

exertion, the Grid Rules would require a finding of disability.  ECF Doc. 11 at 19.  However, he

has not cited specific evidence that would require a finding that he was limited to the sedentary

or light levels.[4]  The fact that DeBose believes the ALJ should have rested his decision on

---

[4] Other than the properly discounted opinion of Dr. Bradford, discussed above.

different record evidence does not mean that the ALJ's decision lacked substantial evidentiary support.  DeBose argues that the evidence could have supported a different RFC finding (ECF Doc. 11 at 17-19), and that may be true; but this court is not permitted to decide the facts anew or reweigh the evidence.  The ALJ's decision fell within his "zone of choice," and this court may not second-guess it.  *Mullen*, 800 F.2d at 545.  Because substantial evidence supported the ALJ's RFC determination, his decision will be affirmed.

**VI.      Conclusion**

By failing to properly apply *Dennard* and AR 98-3(6) the ALJ erred by finding that DeBose could perform his past relevant work, but this error was harmless.  Because the ALJ's decision was supported by substantial evidence and because DeBose has not identified any prejudicial application of legal standards, the final decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.

Dated: July 30, 2020

Thomas M. Parker
United States Magistrate Judge

24